IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jeffrey Ware, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | No.  109 C.D. 2022 |
| | : | No.  110 C.D. 2022 |
| | : | Argued:  March 6, 2023 |
| Trustees of the University of | : | |
| Pennsylvania (Workers' | : | |
| Compensation Appeal | : | |
| Board), | : | |
| Respondent | : | |

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE STACY WALLACE, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                                    FILED:  May 15, 2023


       Barbara Boyer (Claimant), widow of Jeffrey Ware (Decedent), petitions for
review of the January 11, 2022 order of the Workers' Compensation Appeal Board
(Board) affirming the April 1, 2020 order of the Workers' Compensation Judge
(WCJ) that denied Decedent's Claim Petition and dismissed the Fatal Claim Petition
and Penalty Petition Claimant filed on behalf of herself and their two children.
Claimant also appeals the Board's Order affirming the WCJ's decision to grant the
Petition to Review of the Trustees of the University of Pennsylvania (Employer).
After review, we affirm.

## I. Factual and Procedural Background

Decedent's Claim Petition was pending litigation when he died. Claimant filed a Fatal Claim Petition and a Penalty Petition on behalf of herself and their two children. The Board set forth the factual and procedural history as follows:

> Decedent was employed by [Employer] as a researcher. On November 15, 2010, Decedent filed a Claim Petition alleging that repeated exposure to radiation in connection with his job caused gliosarcoma and brain tumors necessitating surgery. Decedent alleged that his last date of exposure was October 5, 2010, and his last date of employment was October 8, 2010. Decedent sought benefits for disability, scarring from the surgery, and medical expenses. [Employer] filed a timely Answer denying the allegations.

> Decedent died on October 23, 2011, during litigation of the Claim Petition. Claimant then filed a Fatal Claim Petition alleging that Decedent died of cancer caused by work-related radiation exposure and seeking benefits for herself and her two children with Decedent. [Employer] opposed the Fatal Claim Petition and the litigation continued.

> On June 4, 2012, Independence Blue Cross filed a Review Medical Petition requesting to intervene in the Claim [proceeding] and asserting a subrogation lien for Decedent's medical treatment in the amount of $ 316,610.00.[1]

> On September 20, 2016, a Notice of Compensation Payable (NCP) was issued that recognized an October 5, 2010, injury described as "multiple head injury" and "occupational disease injury" attributable to repetitive exposure to radiation in connection with Decedent's job. The NCP listed Decedent's date of birth as January 1, 1956. On September 28, 2016, an Amended NCP was issued with the same information as the NCP except that Decedent's date of birth was listed as July 27, 1964.

---

[1] The Board explained, "Independence Blue Cross . . . filed its cross appeal out of an abundance of caution to preserve its lien in the event the Claim Petition is granted at any point." Board Opinion, 1/11/22 (Bd. Op.) at 27. The Board held "[b]ecause we are affirming the denial of the Claim Petition, Independence Blue Cross's appeal cannot succeed, and we affirm the dismissal of its Review Medical Petition." *Id.*

On October 7, 2016, [Employer] filed a Review Petition requesting that the WCJ set aside the NCP and Amended NCP as materially incorrect. [Employer] alleged that it had always denied all allegations of the Claim Petition and Fatal Claim Petition, and it was continuing to do so. Claimant filed an Answer opposing the Review Petition. In addition, on October 27, 2016, Claimant filed a Penalty Petition alleging that [Employer] violated the Workers' Compensation Act (Act)[2] by failing to pay benefits in accordance with the NCP and Amended NCP.

By a Decision and Order circulated on April 1, 2020, the WCJ granted [Employer]'s Review Petition and denied Claimant's Penalty Petition, concluding that [Employer] proved the NCP and Amended NCP were not an admission of liability that Decedent sustained a work-related injury or that his death was work-related, and were not intended to accept the Claims. Rather, the NCP and Amended NCP resulted from an attempt to pay a legal bill and alter Decedent's birth date through a newly-implemented electronic system which had improperly coded the claim as compensable. Concluding that, under the circumstances, the NCP and Amended NCP were void *ab initio*, the WCJ ordered them stricken from the administrative record. The WCJ denied the Claim Petition and Fatal Claim Petition, concluding that Claimant enjoyed a statutory presumption that Decedent's brain cancer was causally related to his work with [Employer], but that [Employer] successfully rebutted the presumption and showed that Decedent's cancer was not caused by his work conditions and employment, but instead was a naturally-occurring event. Finally, the WCJ dismissed Independence Blue Cross's Review Medical Petition seeking subrogation for the medical expenses it paid on behalf of Decedent. Both Claimant and Independence Blue Cross appeal.

Bd. Op. at 1-3 (internal citations and footnotes omitted).

## II.    Discussion

Claimant presents four issues on appeal. Claimant asserts the WCJ erred as a matter of law by: (1) granting Employer's Review Petition to set aside the NCP and Amended NCP (collectively, the NCPs); (2) denying her Penalty Petition; (3) finding Employer overcame the statutory presumption of disability under Section 301(c) of

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

3

the Act, 77 P.S. § 411; and (4) failing to award Decedent benefits for his lifetime claim from the date of injury until Decedent's date of death. Claimant's Brief at 8.

In a workers' compensation appeal, we are limited to determining whether the necessary findings of fact are supported by substantial evidence, whether the Board committed an error of law, or whether the Board's decision violates a party's constitutional rights. *See Elberson v. Workers' Comp. Appeal Bd. (Elwyn, Inc.)*, 936 A.2d 1195, 1198 n.2 (Pa. Cmwlth. 2007). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Eureka Stone Quarry, Inc v. Dep't of Env't Prot.,* 957 A.2d 337, 344 (Pa. Cmwlth. 2008). We exercise plenary, de novo review over questions of law. *Sedgwick Claims Mgmt. Servs., Inc. v. Bureau of Workers' Comp., Fee Rev. Hearing Off. (Piszel & Bucks Cnty. Pain Ctr.),* 185 A.3d 429, 433 n.2 (Pa. Cmwlth. 2018). In other words, we may review the entire record. *Probst v. Dep't of Transp., Bureau of Driver Licensing,* 849 A.2d 1135 (Pa. 2004).

Questions of credibility, conflicting medical evidence, and evidentiary weight fall within the WCJ's authority, and the WCJ is free to accept the testimony of any witness, including medical witnesses, in whole or in part. *Ingrassia v. Workers' Comp. Appeal Bd. (Universal Health Servs., Inc.),* 126 A.3d 394, 399 n.5 (Pa. Cmwlth. 2015). The WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight; the WCJ's decision, however, must be based on substantial evidence. *Thompson v. Workers' Comp. Appeal Bd. (USF&G and Craig Welding Equipment Rental),* 781 A.2d 1146, 1150 (Pa. 2001).

In her first issue on appeal, Claimant asserts the WCJ erred as a matter of law by granting Employer's Review Petition to set aside the NCPs. Section 413 of the Act provides, "[a] workers' compensation judge may, at any time . . . set aside a

4

notice of compensation payable . . . if it be proved that such notice of compensation payable . . . was in any material respect incorrect." 77 P.S. § 771. The burden of proof is on the party seeking to modify the NCP to establish a material mistake of fact or law was made at the time the NCP was issued. *Anderson v. Workers' Comp. Appeal Bd. (Pa. Hosp.),* 830 A.2d 636 (Pa. Cmwlth. 2003).

Employer provided substantial evidence the NCPs were materially incorrect at the time they were issued and that their very issuance was an error. The WCJ heard evidence about the computer systems the Bureau of Workers' Compensation (Bureau) used and about the transition from one system to another. Electronic Data Interchange (EDI) is the electronic way of submitting claim information to the Bureau. WCJ Opinion, 3/12/20 (WCJ Op.) ¶ 29. Harte Pricer (Pricer), manager of the EDI section of the claims management division of the Bureau, testified about the transition from the old system to the newer Workers' Compensation Automation and Integration System (WCAIS). *Id*. The WCJ found the testimony of Pricer credible that "[Decedent's] claim was always erroneously coded as compensable in the Bureau's . . . computer systems." *Id*. ¶ 33(i). Paul Kelly (Kelly), a senior account claims representative for PMA Management Corp. (PMA), Employer's insurer, testified he was "dumbfounded" when he changed Decedent's birth date in the PMA system, and it generated a request to the Bureau. *Id*. ¶ 30. Further, he "did not intend" to produce new forms or to make any determination, as it was not his case. *Id*.

The WCJ found Kelly engaged EDI "only to change [Decedent]'s date of birth with no intent to accept or acknowledge his claim as compensable" and found his testimony credible and persuasive. *Id*. ¶ 33(j). Two additional witnesses for Employer explained they engaged EDI only to pay a legal bill and change a birth

date, they had no intent to accept or acknowledge the Decedent's claim as compensable, and the NCP was issued unintentionally. *Id.* ¶ 33(k). A PMA claims manager stated Decedent's claim was coded "[f]ull denial" in its internal system. *Id.* ¶ 32. The WCJ found PMA had no intent to accept Decedent's claim as compensable and sought to correct the erroneous issuance of an NCP within hours of discovery. *Id.* ¶ 33(l). Likewise, the Board acknowledged Employer "vigorously defended against [Decedent's claim] and Fatal Claim Petitions at all times over a course of several years, and there was never an intent to accept Decedent's or Claimant's Claims." Bd. Op. at 12. Substantial evidence exists to support a finding the NCPs were materially incorrect when they were issued.

Next, we address Claimant's second and fourth issues together as the validity of the NCPs is at issue in both. Claimant argues the WCJ erred as a matter of law when he denied the Penalty Petition because Employer failed to pay indemnity benefits on the NCPs and erred in failing to award Decedent benefits when the NCPs were not judicially set aside.

When, as here, Claimant seeks a penalty for Employer's violation of the Act, the burden of proof is on Employer to show no violation of the Act occurred, but Claimant must first show payments were actually suspended or terminated. *See Ortiz v. Workmen's Comp. Appeal Bd. (Fair Tex Mills, Inc.),* 518 A.2d 1305 (Pa. Cmwlth. 1986). In this matter, there is no allegation payment was suspended or terminated. Rather, Employer never made payment. The WCJ found, and the Board agreed, no obligation to pay ever existed as the NCPs were void *ab initio*.

Even if a violation of the Act is apparent from the record, imposition of a penalty for that violation is not automatic; instead, imposition of a penalty is left to the discretion of the WCJ. *Ortiz,* 518 A.2d at 1308 n.4. The WCJ determined the

6

NCPs were issued as a result of error. A computer system error issued the NCPs and, therefore, a material error existed at their issuance. As such, the WCJ found the NCPs were void *ab initio*, and Employer had no obligation to pay benefits.

In her final issue on appeal, Claimant argues the WCJ erred as a matter of law in finding Employer overcame the statutory presumption under Section 301(c) of the Act. Under Section 301(c)(1) of the Act, an employer is liable to pay benefits arising from a work-related injury. 77 P.S. § 411(1). Section 301(c)(2) of the Act defines injury to include an "occupational disease as defined in [S]ection 108[3] of [the Act]." 77 P.S. § 411(2). In relevant part, Section 108 the Act defines an occupational disease as follows:

> The term "occupational disease," as used in this act, shall mean only the following diseases.
> . . . .
> (f) Radium poisoning or disability, due to radioactive properties of substances or to Roentgen-ray (X-rays) in any occupation involving direct contact with, handling thereof, or exposure thereto.
> . . . .
> (n) All other diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population. . . .

77 P.S. § 27.1.

We conclude there is no "occupational disease" listed for radiation lab researchers in Section 108 of the Act. Specific to radiation, only radium poisoning or disability and Roentgen-ray (X-rays) appear. Radium is a naturally occurring heavy metal, and there was no evidence presented Decedent was exposed to radium or X-rays in his position with Employer. Further, Section 108 of the Act does not

---

[3] Added by the Act of October 17, 1972, P.L. 930.

mention cancer related to Decedent's occupation. In order to take advantage of the "catch-all" definition of Section 108(n), a claimant is required to prove the following: (1) the condition is one to which he was exposed by reason of his employment; (2) the condition is causally related to the industry or occupation in which he was employed; and (3) incidence of the condition is substantially greater in his industry or occupation than in the general population. *Pawlosky v. Workmen's Comp. Appeal Bd. (Latrobe Brewing Co.),* 473 A.2d 260, 272 n.4 (Pa. Cmwlth. 1984).

To use the "catch-all" provision, Claimant must meet all the requirements set out in subsection (n) of Section 108. We conclude Claimant failed to meet any of the three requirements. We set forth excerpts from the Board's Opinion addressing the testimony of two witnesses for Employer, David Hoel, Ph.D. (Dr. Hoel) and Fred Mettler, Jr., M.D. (Dr. Mettler).[4]

> Dr. Mettler testified that gliosarcoma is a very rare brain cancer with approximately two naturally occurring cases every year in the Philadelphia area. He further testified that ionizing radiation is a relatively weak carcinogen and gliosarcoma is not caused by low doses of ionizing radiation. Dr. Mettler testified that when people or animals are irradiated by a LINAC machine, they themselves do not become radioactive. Dr. Mettler testified that Decedent would have to be exposed to hundreds of thousands or millions of millirem of radiation to cause a problem in his brain. There was no evidence of anything in [Employer's] lab that emitted non-columnated levels anywhere near that. Further, such exposure would cause damage to other tissues in the body and cataracts in his eyes and serious acute illness or death within 30 days, but Decedent did not have those things. Thus, Dr. Mettler testified it was impossible that Decedent received such a dose of radiation generally in [Employer's] lab. The LINAC machine could produce a columnated dose of radiation large enough to cause brain cancer, but Decedent would have to put his head directly into the

---

[4] Dr. Hoel is a Doctor of Mathematical Statistics with expertise in radiation epidemiology and Dr. Mettler is a physician with a Master's Degree in Public Health. WCJ Op. ¶ 35.

LINAC machine and hold it there to get such a large, targeted radiation dose and he did not do that. Dr. Mettler testified that epidemiological studies show there is no increased risk of brain tumors in nuclear workers exposed to low doses of radiation. Moreover, the latency period for most radiation-induced brain tumors is approximately 20 years after exposure. Dr. Mettler opined that Decedent is "an unfortunate and tragic case of an individual with an incurable aggressive brain tumor who does not have enough documented evidence of radiation [exposure] to cause the tumor." Rather, Dr. Mettler opined that Decedent's gliosarcoma "was one of the two cases of gliosarcoma which normally are expected to appear in Philadelphia each year."

The WCJ accepted as credible Decedent's testimony of working at times with ionizing radiation at [Employer's] worksite. The WCJ rejected the opinions of Claimant's medical expert, Dr. Glass, regarding the work-related causation of Decedent's brain cancer as "equivocal, speculative, unsupported by facts, not credible, and borderline incompetent." The WCJ credited the opinions of Dr. Brown, Dr. Miller, Dr. Frazier, and Dr. Hoel, and credited the testimony of Dr. Mettler regarding causation.

Bd. Op. at 18-19 (internal citations and footnotes omitted).

Dr. Hoel noted brain cancer among radiation workers is "less than that of the general public's risk." WCJ Op. ¶ 19. He further noted radiation workers over many years show a "protective effect of radiation and brain cancer" and are "shown to be at a decrease[d] risk with increasing radiation exposure." *Id.* ¶ 32. There was credible evidence the risk of brain cancer is no greater for radiation lab workers than the general population, rather it is less than the general population's risk.

As there is no "occupational disease" specific to radiation lab workers, Claimant must satisfy the three-part test in Section 108(n). For one part of the test, Claimant must establish the incidence of brain cancer is substantially greater in the industry or occupation than in the general population. The WCJ accepted the testimony of Dr. Hoel that brain cancer in radiation workers is less than in the general public. The WCJ's finding, supported by substantial and credible evidence, results

9

in Claimant's failure to satisfy this part of the test in Section 108(n). As all three parts of the test must be met, we need not reach the others.

Assuming, arguendo, Decedent's specific brain cancer is an occupational disease under Section 108 of the Act, Section 301(e)[5] of the Act provides, "it shall be presumed that the employee's occupational disease arose out of and in the course of employment, but this presumption shall not be conclusive." 77 P.S. § 413. Therefore, it is a rebuttable presumption. The WCJ found Employer "credibly and conclusively rebutted the statutory presumption due [Decedent], the [WCJ] was persuaded by the well-developed and well-sourced opinion of Dr. Mettler that [Decedent]'s brain cancer was not work-related but a naturally occurring event." WCJ Op. at 35. Likewise, the Board concluded the "evidence submitted by [Employer] was sufficient to rebut the presumption in Section 301(e)." Bd. Op. at 26.

### III.    Conclusion

Based on the foregoing, we conclude the WCJ's findings were supported by substantial evidence, and the Board did not err in affirming the WCJ's April 1, 2020 decision. Accordingly, the January 11, 2022 order of the Board is affirmed.

_____
STACY WALLACE, Judge

---

[5] Added by the Act of October 17, 1972, P.L. 930.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jeffrey Ware, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | No. 109 C.D. 2022 |
| | : | No. 110 C.D. 2022 |
| | : | |
| Trustees of the University of | : | |
| Pennsylvania (Workers' | : | |
| Compensation Appeal | : | |
| Board), | : | |
| Respondent | : | |

# **O R D E R**

**AND NOW**, this 15th day of May 2023, the January 11, 2022, Order of the Workers' Compensation Appeal Board is **AFFIRMED**.

_____
STACY WALLACE, Judge